[Civ. No. 12303. First Dist., Div. Two. Jan. 4, 1943.]

Estate of GEORGE WOLLEB, Deceased. ROSE GISLER, Appellant, v. ANNA OLIVA et al., Respondents.

John B. Ehlen for Appellant.

James F. Brennan, Walter McGovern, and Harrison W. Call for Respondents.

STURTEVANT, J.—This is an appeal from a judgment in favor of contestants and against the proponent in a proceed-

ing to contest a will. George Wolleb, a single man seventy-four years of age, had accumulated a fortune in excess of $20,000. The estate consisted of a house and lot at Colma and the rest of the estate was money on deposit in a bank at Colma. On the 4th day of January, 1934, he executed a will. On the 22nd day of November, 1940, he executed another will. On the 18th day of February, 1941, it is claimed he executed another will. He died on February 20, 1941. Shortly thereafter Rose Gisler filed a petition praying that the will last mentioned be admitted to probate and that letters be issued to her as administratrix. Shortly thereafter Anna Oliva filed a petition asking that the 1934 will be admitted to probate and at the same time she filed a contest against the 1941 document. At about the same time Henry Gehrig filed a petition asking that the 1940 document be admitted to probate and that he be appointed executor. At the same time he also filed a contest against the 1941 document. The contests were answered and the several petitions and contests were heard together. The hearing took several days and a large number of witnesses were examined and cross-examined. The reporter's transcript consists of nearly a thousand folios. The trial court granted the petition of Gehrig, denied the petition of Rose Gisler, and denied the petition of Anna Oliva. From that judgment Rose Gisler has appealed. No point is made as to the validity of the will dated November 22, 1940, in the event that the document dated February 18, 1941, was properly denied probate.

No question of pleading is presented. In the contest filed by Gehrig he contended that George Wolleb was of unsound mind at the time the document dated February 18, 1941, purports to have been executed; and that said document was obtained by undue influence imposed on the volition of George Wolleb by Rose Gisler. Both contentions were denied. The issues were heard by the trial court and it made findings in favor of Gehrig and against Rose Gisler on both issues.

The proponent does not claim that there was no evidence which supported the finding that decedent was of unsound mind, however she seeks to weaken the force and effect of the evidence and asks this court to hold that the evidence of the contestants was so unsubstantial as not to create a conflict. We are not inclined to so hold. For several years the decedent had consulted Dr. Drees as his physician. The latter treated him for heart trouble. On February 14, 1941,

the decedent was admitted to the Junipera Serra Hospital of which Dr. Drees was the owner. At that time the decedent complained of a cold and pains in his chest. He was admitted to the hospital, put to bed, and treated for the cold and for heart trouble. The record shows that he was a very sick man. On February 18, 1941, the purported will was executed. On February 20, 1941, George Wolleb died. While in the hospital he suffered pains in his chest, was short of breath, most of the time he was drowsy, and at times he was delirious. Digitalis was administered as a drug and from time to time he was given nasal injections of oxygen. At about half past four p.m. on February 18, 1941, the proceedings were had regarding the purported execution of the will. It is an admitted fact that on that occasion J. T. Cline, the decedent's attorney, Rose Gisler and Fred Hernandez were standing about the bed of George Wolleb. Norma Toso, a nurse, was there a part of the time but left the room just before the writing had been completed. Katherine Naylor, another nurse, came into the room just as the writing had been completed. Henry Gehrig came to the room and was standing in the doorway just at the moment Katherine Naylor wrote something on the paper. Mr. Cline testified regarding the proceedings. It will be conceded at once that if there were no contradictions in the record his testimony would show that the will was duly and regularly executed and that the decedent was of sound mind. However there was evidence to the effect that the decedent was so weak that when it came time for him to sign that he held the pen in his hand, his hand shook, and that Mr. Cline stated to the decedent that he could make a cross if he was too weak to sign his name. Thereupon the decedent made a cross and later Mr. Cline wrote "George Wolleb" and then signed his own name as witness. Mr. Cline testified that when he entered the room the decedent spoke to him, gave him directions to write a will, and what to put in it; that he, Mr. Cline, wrote a will and, upon reading it to the decedent, the latter called his attention to the fact that he wanted a provision inserted directing that he be buried in Cypress Lawn Cemetery; that he, Mr. Cline, then drafted another will, read it to the decedent paragraph by paragraph, and asked the decedent if each paragraph correctly expressed his wishes and the decedent replied that it did; that he, Mr. Cline, then

asked the decedent if he wanted the persons present to act as witnesses; that the decedent answered he did; that he, Mr. Cline, then signed decedent's name and wrote his own name as a witness; and that the other witnesses then signed and left the room. Gehrig, an intimate acquaintance of thirty-five years, stood by the door. He testified: "That about fifteen seconds after the said witnesses left the room he approached the bed of decedent and said 'Hello George'"; that the latter "looked around, his eyes were stary, glassy, and half closed and he said in a low voice 'Home.' That's all I got. That is all I understood. He didn't answer anything. He didn't even recognize me. . . . He was of unsound mind." At about the same time Gehrig said to Rose Gisler, "What in the world is the man doing making out a will in a dying condition? He don't know what he is doing. He is in delirium." That testimony is not controverted.

Karl Wolleb, a brother of the decedent, and Anna Meyer, an acquaintance of several years, both testified that they were at the hospital from two to four p.m., immediately prior to the execution of the will. Karl testified that the decedent at that time was half dead and in a comatose condition and that he did not speak to anyone while he, Karl, and Mrs. Meyer were at the hospital. Without attempting further to digest the contents of a transcript of nearly one thousand folios, it is sufficient to state that the finding that the decedent was of unsound mind at the time it is claimed he executed said will was supported by substantial evidence.

Another attack vigorously pressed by the proponent is that the finding that she exercised undue influence on the volition of the decedent is not supported by the evidence. Finding number III is as follows: "That on the 18th day of February, 1941, and at the time the said purported will and testament of February 18, 1941, was executed, and for a long time next prior thereto, the said George Wolleb, deceased, was in a weak and impaired mental and physical condition and easily influenced, and at said times reposed great confidence and trust in one Rose Gisler; that the said Rose Gisler did, during all of such times and particularly on the 18th day of February, 1941, when said last will and testament was executed, suggest and instruct said deceased to make said will and caused her will to be substituted for the will of said deceased, and at the time of the execution of said writing purporting to be the last will and testament of

said deceased, said deceased was not following the dictates of his own will, but at said times he was acting wholly under the duress, menace, fraud, influence, dictates, and domination of said Rose Gisler, who suggested and dictated to said deceased the terms of said will, and said purported will was not the free and voluntary act of said deceased, but was made under the duress, menace, fraud, and undue influence and control of said Rose Gisler." The admitted facts are that approximately five years before George Wolleb died he purchased a house and lot at Colma. Afterwards he rented said property to his niece Rose Gisler. However he continued to room and board in the house at $30 per month. During all of those times she cared for him as a roomer and a boarder. He was upwards of seventy years of age, suffering from heart trouble and other infirmities and in need of care. He was addicted to the excessive use of intoxicating liquor and frequently became drunk. When he came to the house in that condition she attended to taking him in and putting him to bed. At all times she had liquor in the house and was engaged in selling the same. At times she sold to him. During the same period of time she was the custodian of his bank book and trunks containing his personal effects. He made many wills. In each will she was named as a devisee, the amount of the bequest varying in the different wills. From the time the decedent was taken to the hospital and until he died the proponent made many trips to the hospital and sometimes stayed there all night. During said period she telephoned Mr. Cline to come and draw the will. When the decedent's body was at the undertaking parlors a wake was held. While attending the wake she had a conversation with her sister, Anna Oliva. In the conversation she exhibited an envelope and stated to Anna, "You know Gehrig got a will out of him, but I beat his time and I got a will out of him too." Under the foregoing facts it is clear that there was evidence sustaining the finding that Rose Gisler at the time the will was made stood in a confidential relation to the decedent. Furthermore it will not be contended that she assumed the burden during the trial of proving that she did not exercise undue influence over the decedent. The burden rested on her to make that showing. (*Estate of Graves,* 202 Cal. 258, 262 [259 P. 935].)

The proponent questions the evidence given by the wit-

nesses for the contestants and points to the financial interest of some of them. Under the instrument executed in 1940, Henry Gehrig was named the residuary legatee and would inherit about $15,000. By a written contract the court found that he had agreed to accept $2,750 and had assigned the rest of his interest to Anna Oliva, John Wolleb, Karl Wolleb, and Tony Wolleb. Under the instrument dated in 1941, Rose Gisler was named residuary legatee and stood to inherit about $15,000. Mr. Cline holds a contract which will entitle him to receive one-third of the estate if that will should be admitted to probate. Other witnesses have other interests direct or indirect. We find nothing in the record showing that the trial court did not duly consider such facts in weighing the testimony of each witness called by each party.

 The proponent complains because the trial court received evidence that she was engaged in the business of bootlegging intoxicating liquor. As stated above the contestants alleged that the will dated February 18, 1941, was the result of undue influence imposed by Rose Gisler on the volition of the decedent. If Rose Gisler was dealing in and selling intoxicating liquor to her patrons it is obvious she was in a position to sell or give decedent quantities of liquor and thus unduly influence him. Under the issues presented the evidence complained of was not wholly irrelevant or immaterial. Whether such liquor traffic was legal or illegal, furnishing intoxicating liquor to the decedent by Rose Gisler was material. In other words it was material for contestants to show if they could that Rose Gisler was in a position to exercise undue influence on and over the decedent. (*Estate of Hampton,* 39 Cal.App.2d 488, 498 [103 P.2d 611].)

 She also complains because the trial court received evidence of the fact that she and Fred Hernandez were at the time the will was executed, and had been for some years before, living together as man and wife. The contestants reply that the evidence was admissible for the purpose of showing bias of Fred Hernandez in favor of the proponent. We think that that reply is quite sufficient. (*Estate of Kasson,* 127 Cal. 496, 500 [59 P. 950].)

 During the trial the proponent offered in evidence the death certificate of George Wolleb. The trial court admitted it for the purpose of proving death. It was admissible for the purpose for which it was admitted. (*Estate of Lenci,* 106 Cal.App. 171, 175 [288 P. 841].) But the proponent

claims that said certificate was admissible as evidence in proof of all facts therein contained. (Health and Saf. Code, § 10551.) Assuming, without deciding, that claim to be sound, we find no prejudicial error in the ruling. The certificate recites "Immediate cause of death cardiac failure due to arterio sclerosis." Neither of those facts was in issue. Both recitals were merely cumulative of other evidence that was contained in the record.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing was denied February 3, 1943, and appellant's petition for a hearing by the Supreme Court was denied March 1, 1943.